In re Heidi L. STIPETICH, Debtor.

Heidi L. Stipetich, Plaintiff,

v.

First Mount Vernon Industrial Loan
Association, Defendant.

Bankruptcy No. 02–29200–MBM.
Adversary No. 02–2543–MBM.

United States Bankruptcy Court,
W.D. Pennsylvania.

June 20, 2003.

Steven T. Shreve, Glosser & Shreve, Pittsburgh, PA, for Debtor.

Joseph M. Fornari Jr., Office of the U.S. Trustee, Pittsburgh, PA, for U.S. Trustee.

### MEMORANDUM AND ORDER OF COURT

M. BRUCE MCCULLOUGH, Bankruptcy Judge.

**AND NOW,** this **20th day** of **June, 2003,** upon consideration of (a) the adversary complaint of Heidi Stipetich, the above-captioned debtor and plaintiff herein (hereafter "the Debtor"), which adversary complaint contains three counts for, in particular, (i) violation of Maryland's usury laws, (ii) constructive fraudulent conveyance under 11 U.S.C. § 548 and Maryland's fraudulent conveyance provisions, and (iii) common law fraud, (b) the Debtor's motion for partial summary judgment, wherein the Debtor appears to seek summary judg-

ment on her usury law violation and constructive fraudulent conveyance counts, (c) the response and cross-motion for partial summary judgment by First Mount Vernon Industrial Loan Association, defendant herein (hereafter "First Mount Vernon"), wherein First Mount Vernon seeks summary judgment in its favor on the same two counts for which the same is presently sought by the Debtor, and (d) the numerous other submissions in the matter filed by the parties; and subsequent to notice and a hearing on the matter held on May 21, 2003, it is hereby **ORDERED, ADJUDGED, AND DECREED** that (a) with respect to the Debtor's usury law violation count, First Mount Vernon's cross-motion for summary judgment is **GRANTED** and the Debtor's motion for summary judgment is **DENIED WITH PREJUDICE**, and (b) with respect to the Debtor's constructive fraudulent conveyance count, both the Debtor's motion for summary judgment and First Mount Vernon's cross-motion for summary judgment are **DENIED WITHOUT PREJUDICE**. The rationale for the Court's decision is set forth in detail below.

## I.

The Debtor alleges in Count 1 of her adversary complaint that at least some portion of the interest charges and other fees that First Mount Vernon imposed upon the Debtor for a $550,000 loan that First Mount Vernon extended to the Debtor in March 2001 (hereafter "the FMV Loan") violates Maryland's usury laws. In particular, the essence of the Debtor's usury claim appears to be that some portion of the interest charged by First Mount Vernon on the FMV Loan, first at a rate of 18% and then, subsequent to the FMV Loan going into default, at a rate of 24%, as well as at least some portion of the other fees that were charged by First Mount Vernon on such loan, are usurious pursuant to Maryland's usury laws because (a) the FMV Loan, argues the Debtor, is not a commercial loan within the meaning of Maryland's usury laws, and (b) First Mount Vernon, apparently argues the Debtor, could, with respect to the FMV Loan, neither charge interest at the aforesaid rates charged nor collect a portion of the other fees charged unless such loan is such a commercial loan. Without conceding what portion of the interest and other fees relative to the FMV Loan would be usurious in the event that the FMV Loan is not a commercial loan, First Mount Vernon appears to concede that, if the FMV Loan is not a commercial loan within the meaning of Maryland's usury laws, then at least some portion of such interest and fees are usurious under Maryland law.[1] However, and as one would expect, First Mount Vernon maintains that the FMV Loan is a commercial loan within

---

1. First Mount Vernon asserts, and the Court agrees, that none of the interest or other charges relative to the FMV Loan would have been usurious had the FMV Loan been extended to the Debtor pursuant to the provisions of Subtitle 10 of Title 12 of Maryland's Annotated Code (Credit Grantor Closed End Credit Provisions). *See* Md.Code Ann., Commercial Law § 12–1003(a) (West 2003) (maximum interest charged on FMV Loan was equal to 24% annually, which rate is authorized under this statutory provision) & Md. Code Ann., Commercial Law § 12–1005 (West 2003) (see, in particular, subsection (a)(3)(i),

which allows for unlimited fees if a loan is "[s]ecured by a first lien on residential real property;" FMV Loan was secured by first lien on what the Debtor contends is residential realty). However, First Mount Vernon concedes that (a) it needed to make an election to lend under such subtitle, which election it did not make when extending the FMV Loan to the Debtor, and (b) the provisions of such subtitle are thus irrelevant to a determination now as to whether certain of the interest and other charges relative to the FMV Loan are usurious under § 12–103.

the meaning of Maryland's usury laws. First Mount Vernon further argues that, by virtue of signed written declarations made by the Debtor when the FMV Loan was advanced to her, the Debtor is equitably estopped[2] from denying that the FMV Loan is a commercial loan.

The parties appear to agree, and in any event a genuine factual dispute does not exist, that (a) the FMV Loan actually operated to refinance a prior loan obtained by the Debtor from a lender other than First Mount Vernon (hereafter "the 1st Refinancing Loan"), which prior loan itself operated to refinance an initial mortgage loan of $350,000 that the Debtor obtained from yet a third distinct lending institution (hereafter "the Initial Loan"), (b) the FMV Loan, the 1st Refinancing Loan, and the Initial Loan are or were each secured solely by a mortgage or a deed of trust on a particular piece of Maryland realty that was owned by the Debtor when she obtained each such loan (hereafter "the Maryland Realty"), (c) the Debtor obtained the Initial Loan with the purpose of investing the proceeds therefrom in an entity entitled U.S. Funding, see 12/13/02 Stipetich Dep., Docket No. 19, p. 121, lines 17—21, (d) the Debtor actually invested all $350,000 of the proceeds from the Initial Loan in U.S. Funding and thereby obtained an ownership interest therein, see Id., and (e) the Debtor obtained both the 1st Refinancing Loan and the FMV Loan for the purpose of staving off a foreclosure on the Maryland Realty. The Debtor also

maintains, and the Court does not understand First Mount Vernon to dispute, that, although the Debtor intended to and did invest the $350,000 in proceeds from the Initial Loan in U.S. Funding, she was actually swindled out of said $350,000 by virtue of entering into such investment transaction, which investment transaction, she argues, was the perpetration of a fraud by the principal owner of U.S. Funding.

The Court holds, as a matter of law, that interest charged by First Mount Vernon on the FMV Loan that is not in excess of 18% annually, and that portion of the other fees relative to the FMV Loan that may statutorily be considered to be interest by a provision of Maryland's usury laws (hereafter collectively referred to with other interest charged on the FMV Loan as "interest") and that, in conjunction with the other interest charged on the FMV Loan, does not exceed 18% on an annual basis, is not usurious under Maryland's usury laws regardless of whether the FMV Loan is a commercial loan. The Court holds as it does because:

(a) the default maximum interest rate that can be charged with respect to loans in Maryland is 6%, see Md. Code Ann., Commercial Law § 12–102 (West 2003);

(b) absent the applicability of one of the numerous exceptions set forth in Md.Code Ann., Commercial Law § 12–103(b)—(f), "a lender may charge interest at an effective rate

---

**2.** First Mount Vernon, at various points in its first Memorandum of Points and Authorities, characterizes its estoppel position as one that is predicated upon the application of the doctrine of collateral estoppel rather than equitable estoppel. The preceding notwithstanding, however, First Mount Vernon supports its estoppel position by quoting at length from and citing liberally to decisions that deal with the doctrine of equitable rather than collateral estoppel. Furthermore, it is clear to the

Court that (a) the doctrine of collateral estoppel has no applicability to the instant matter, and (b) the doctrine of equitable estoppel is particularly germane to a resolution of the instant matter, see infra pp. 14–18. Therefore, the Court shall henceforth refer to First Mount Vernon's estoppel position as one that is predicated upon the application of the doctrine of equitable rather than collateral estoppel.

of simple interest not in excess of 8 percent per year on the unpaid principal balance of a loan if there is a written agreement signed by the borrower which sets forth the stated rate of interest charged by the lender," Md.Code Ann., Commercial Law § 12–103(a)(1) (West 2003);

(c) the parties do not dispute that there exists a written agreement that was signed by the Debtor which sets forth the 18% and 24% rates to be charged by First Mount Vernon relative to the FMV Loan, which means that, by virtue of § 12–103(a)(1), a maximum interest rate of at least 8% thus may be charged with respect to the FMV Loan;

(d) "[i]f a loan made under … [§ 12–103(a)(1) ] is secured by the pledge of collateral which is other than a savings account or if such loan is unsecured, the lender may charge a rate of interest not in excess of 18 percent," Md.Code Ann., Commercial Law § 12–103(a)(3) (West 2003); and

(e) the parties do not dispute that the FMV Loan is secured only by the Maryland Realty, which means that, by virtue of § 12–103(a)(3), an interest rate of at least 18% may be

charged with respect to the FMV Loan rather than the 8% ceiling rate called for by § 12–103(a)(1), and regardless of whether the FMV Loan is a commercial loan.[3]

The Court also holds, as a matter of law, that interest charged by First Mount Vernon on the FMV Loan that exceeds 18% on an annual basis will not be usurious under Maryland's usury laws provided that the FMV Loan is a commercial loan. The Court holds as it does because:

(a) "[a] lender may charge interest at any rate if the loan is … (ii)[a] commercial loan in excess of $15,000 not secured by residential real property; or (iii)[a] commercial loan in excess of $75,000 secured by residential real property," Md.Code Ann., Commercial Law § 12–103(e)(1)(ii) & (iii) (West 2003);[4] and

(b) the initial principal balance of the FMV Loan greatly exceeded $75,000, which makes insignificant any dispute that the parties may have as to whether the Maryland Realty that indisputably collateralizes the FMV Loan is residential in nature—if such realty is not residential in nature, then § 12–103(e)(1)(ii) applies provided that the FMV Loan

---

3. Md.Code Ann., Commercial Law § 12–103(a)(3) also provides that:

on a loan made on or after July 1, 1982, a lender may charge an effective rate of simple interest not in excess of 24 percent per year on the unpaid principal balance, provided that[, *inter alia*,] … (v)[t]he loan does not include a balloon payment, unless payment in full is due on demand or in one year or less.

Md.Code Ann., Commercial Law § 12–103(a)(3) (West 2003). However, First Mount Vernon cannot utilize this particular portion of Maryland's § 12–103(a)(3) as statutory authority to charge 24% interest on the FMV Loan because (a) such loan includes a balloon payment, *see* 12/13/02 Stipetich Dep., Docket

No. 19, Ex. 1 (Balloon Deed of Trust Note, p. 1), and (b) full payment on such loan was due neither on demand nor within one year after such loan was made (FMV Loan was made on March 12, 2001, and full payment was not due until April 1, 2002), *see Id.*

4. Md.Code Ann., Commercial Law § 12–103(e)(1)(i) provides that "[a] lender may charge interest at any rate if the loan is … [a] loan made to a corporation." Md.Code Ann., Commercial Law § 12–103(e)(1)(i) (West 2003). Section 12–103(e)(1)(i) obviously does not apply with respect to the FMV Loan given that the same was made to the Debtor, who is an individual rather than a corporation.

is a commercial loan, and if such realty is residential in nature, then § 12–103(e)(1)(iii) applies provided that the FMV Loan is a commercial loan.

Finally, however, the Court holds, as a matter of law, that interest charged by First Mount Vernon on the FMV Loan in excess of 18% annually will be usurious under Maryland's usury laws if the FMV Loan is not a commercial loan. The Court holds as it does because:

(a) 18%, as set forth above, is established as the ceiling rate that may be charged for annual interest on the FMV Loan unless one of the exceptions set forth in Md.Code Ann., Commercial Law § 12–103(b)—(f) applies to such loan; and

(b) First Mount Vernon, as alluded to above, appears to concede, and the Court concludes as well in any event, that the only one of the many exceptions to the 8% and, thus, the 18% ceiling rate contained in Md.Code Ann., Commercial Law § 12–103(b)—(f) that can apply to the FMV Loan is that set forth in § 12–103(e)(1)(ii) or (iii) for a commercial loan.

Based upon the foregoing analysis, the Court agrees with what the parties appear to have resolved themselves, namely that the issue key to a resolution of the Debtor's usury law violation count is whether the FMV Loan is a commercial loan.

A commercial loan under the Maryland usury laws "means a loan which is made: (1)[s]olely to acquire or carry on a business or commercial enterprise; or (2)[t]o any business or commercial organization." Md.Code Ann., Commercial Law § 12–101(c) (West 2003). The parties agree that § 12–101(c)(2) does not apply to the FMV Loan since such loan was made to the Debtor, who is an individual rather than a business or commercial organization. However, the parties dispute whether § 12–101(c)(1) applies to the FMV Loan, with the Debtor advancing several reasons for her position that such provision does not so apply and that the FMV Loan, consequently, is not a commercial loan. First, the Debtor argues that the FMV Loan is (a) a simple refinancing of a previous mortgage loan collateralized by the Maryland Realty, which refinancing the Debtor obtained, not for investment purposes, but rather so as to stave off a foreclosure upon the Maryland Realty, and (b) consequently not a commercial loan by virtue of § 12–101(c)(1). By making this particular argument, the Debtor necessarily takes the position that the character of the FMV Loan should be ascertained without any regard for the characterization of the Initial Loan, notwithstanding that, and as the parties agree, the FMV Loan refinanced an earlier refinancing of the Initial Loan, which latter loan was obtained with an obvious purpose of investment. Second, the Debtor contends (a) that, even if a characterization of the Initial Loan controls when making a determination as to the character of the FMV Loan, the ultimate employment of the Initial Loan proceeds rather than the purpose for which such proceeds were sought controls when making a determination as to the Initial Loan's character, (b) that the ultimate employment of the Initial Loan proceeds was not their investment in U.S. Funding but rather their fraudulent and tortious conversion by the principal owner of U.S. Funding, (c) that a loan the proceeds of which are so converted cannot be characterized as one for investment purposes, and (d) that the FMV Loan is, consequently, not a commercial loan by virtue of § 12–101(c)(1). Finally, the Debtor maintains that, even if the purpose for which the Initial Loan was obtained by the Debtor controls when making a determination

as to the character of the Initial Loan and, thus, the FMV Loan, and even though the purpose of the Initial Loan was to make an investment in U.S. Funding, the Initial Loan is still not one that was made to acquire or carry on a business or commercial enterprise. The Debtor so argues, *inter alia,* because, argues the Debtor in turn, a loan sought so as to permit an investment in a business or commercial enterprise—and the Debtor concedes that the purpose of the Initial Loan was such because the Debtor concedes that such loan was sought solely for the purpose of making an investment in U.S. Funding, *see* 12/13/02 Stipetich Dep., Docket No. 19, p. 121, lines 17—21, which entity is a for-profit corporation and, thus, also a business or commercial enterprise—is not necessarily the equivalent of a loan that is made to acquire or carry on the same.

## A. *The Proper Method of Characterizing the Initial Loan.*

■ Addressing first the second of the three arguments advanced by the Debtor and recounted in the preceding paragraph, the Court rejects such argument for at least two reasons. First, even if the ultimate employment of the Initial Loan proceeds rather than the purpose for which such proceeds were sought controls when making a determination as to the character of the Initial Loan, the Court cannot accept that the Initial Loan proceeds were ultimately employed by the Debtor for anything other than to invest in U.S. Funding. Indeed, the Court does not even find the Debtor to genuinely dispute that she ultimately used the Initial Loan proceeds to invest in U.S. Funding. Instead, it appears to the Court that the Debtor confuses how she employed such proceeds, which, as set forth in the immediately preceding sentence, was to make the investment in U.S. Funding, with how she alleges the Initial Loan proceeds were

ultimately employed by the principal owner of U.S. Funding after she made her investment therein. The Court rejects outright, as a matter of law, any notion that how someone other than the Debtor employed the Initial Loan proceeds subsequent to their employment by the Debtor affects a determination as to the character of the Initial Loan. Therefore, even if the ultimate employment of the Initial Loan proceeds is dispositive when ascertaining the character of the Initial Loan, the Initial Loan must be characterized as one for investment.

■ Second, the Court, in any event, holds, as a matter of law, that a loan, for purposes of Maryland's usury laws and § 12–101(c)(1) in particular, is characterized by the purpose for which such loan is sought rather than the ultimate use to which such loan's proceeds might be put by a borrower. Maryland's usury statutes are silent, and caselaw construing the same is nonexistent, with respect to the issue that is the subject of the Court's legal holding set forth in the immediately preceding sentence. However, the Court draws support for such legal holding not only from the fact that the same makes the most sense from a logical standpoint but also from case authority construing an analogous provision of the federal Truth in Lending Act (TILA). *See, e.g., Poe v. First National Bank of DeKalb County,* 597 F.2d 895, 896 (5th Cir.1979) (courts look to purpose of loan to determine whether it fits within exemption to TILA, pursuant to 15 U.S.C. § 1603(1), for credit transaction involving extension of credit primarily for business, commercial, or agricultural purposes); *Stillman v. First National Bank of North Idaho,* 117 Idaho 642, 791 P.2d 23, 25 (App.1990) (same, noting that stated purpose rather than ultimate use of the loan controls exemption determination under 15 U.S.C. § 1603(1)).

Because, and as the Debtor concedes, the purpose for which the Initial Loan was sought was so as to allow the Debtor to make an investment in U.S. Funding, the Initial Loan must be characterized as one of investment.

## B. *The Proper Method of Characterizing the FMV Loan.*

Addressing next the first of the three arguments advanced by the Debtor and recounted several paragraphs above, the Court rejects such argument for two reasons. First, the Court holds, as a matter of law, that a refinancing loan, for purposes of Maryland's usury laws and § 12–101(c)(1) in particular, is characterized by the purpose which prompted the initial loan that is sought to be refinanced by way of said refinancing loan rather than the purpose for which such refinancing is sought. Maryland's usury statutes are silent, and caselaw construing the same is nonexistent, with respect to the issue that is the subject of the Court's legal holding set forth in the immediately preceding sentence. However, the Court draws support for such legal holding from case authority construing an analogous provision of TILA. *See Toy National Bank of Sioux City v. McGarr,* 286 N.W.2d 376, 378 (Iowa 1979) (characterizing refinancing loan by purpose of loan that was refinanced, and holding that a commercial loan that is refinanced is not transformed into a personal loan because such refinancing was obtained to stave off foreclosure on a residence that served as collateral for the initial loan); *Stillman,* 791 P.2d at 26 (same); *but see Anderson v. Lester,* 382 So.2d 1019, 1023 (La.Ct.App.1980) (characterizing refinancing loan by purpose for which refinancing is sought, and holding that a commercial loan is transformed into a personal loan when such commercial loan is refinanced so as to stave off foreclosure on a residence that served as collateral for the initial loan). Furthermore, the Court discounts contrary case authority construing such analogous TILA provision when such contrary authority is considered within the context of usury laws because, if a refinancing of a loan were to operate to transform what was initially a commercial loan into a noncommercial loan, thereby restricting a lender for such refinancing as to the interest rate that it could charge thereon, then the market for many such refinancing loans would greatly diminish if not dry up entirely.[5] Because, and as the

5. The rationale for the conclusion in the text that immediately precedes the instant footnote follows: (1) If the circumstances warrant, and the competitive forces within the lending market support, charging a relatively high rate of interest on a loan, and if such circumstances and competitive forces have not changed when the borrower of such loan seeks to refinance, then one would certainly expect that a lender, generally speaking, would not wish to participate in the refinancing of such loan unless such lender could continue to earn on the refinancing roughly the same return that was earned on the initial loan; and (2) That being the case, if a refinancing can transform what was a loan upon which, relatively speaking, a high interest rate legally could be, and was, charged into one upon which such a rate cannot legally be charged, then one would likewise expect that, provided that a borrower's circumstances do not change and market forces remain constant, the market of available lenders for such refinancing would be extremely slim if nonexistent. Applying the foregoing rationale to the instant Debtor, in particular, the Court suspects that she very well might not have been able to obtain a refinancing of either the Initial Loan or the 1st Refinancing Loan had such refinancing transformed either such earlier loan from a commercial loan, for which a high rate of interest could be, and presumably was, charged, into a non-commercial loan, for which such a rate could not be charged, because the Court understands neither the Debtor's circumstances—primarily her monthly income—nor the competitive forces of the lending market to have appreciably changed

Debtor concedes, the purpose for which the Initial Loan was sought was so as to allow the Debtor to make an investment in U.S. Funding, both the 1st Refinancing Loan and the FMV Loan must also be characterized as one of investment.

■ Second, the Court holds that the Debtor is equitably estopped in any event from denying that the FMV Loan is an investment loan. The law regarding equitable estoppel in Maryland is stated as follows:

> In *Knill v. Knill*, [306 Md. 527, 510 A.2d 546 (1986)] ... we defined equitable estoppel to be " 'the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part requires some corresponding right, either of property, of contract, or of remedy.' "

The cited work describes the general principle underlying estoppel *in pais* as loss-shifting. Pomeroy states, "When one of two innocent persons—that is, persons each guiltless of an intentional, moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts or omissions—has rendered the injury possible."

> In *Grimberg v. Marth*, [338 Md. 546, 659 A.2d 1287 (1995)] ... we restated the elements of estoppel, saying:
>
> > " '[I]t is now well established that 'an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other.'

Indeed, all that is needed to create an equitable estoppel is (1) voluntary conduct or representation, (2) reliance, and (3) detriment.' "

*Chevy Chase Bank, FSB v. Chaires*, 350 Md. 716, 715 A.2d 199, 209 (1998) (citations omitted). The Debtor is equitably estopped to deny that the FMV Loan is at least an investment loan because (a) the Debtor voluntarily signed at least three separate documents at the time when the FMV Loan was made that contain explicit representations, *inter alia*, to the effect that the FMV Loan "will be used entirely for commercial, business and/or investment purposes" (hereafter "the Loan Documents"), *see* Ex. to Def.'s Reply (Borrower Affidavit, Borrower Certifications, and Business and Investment Affidavit), Docket No. 21, (b) First Mount Vernon relied on such signed declarations by the Debtor as evidenced by the fact that First Mount Vernon proceeded to close on the FMV Loan and lent under the presumption that the FMV Loan is one for commercial, business and/or investment purposes, *see supra* p. 638 note 1 (such presumption by First Mount Vernon follows because, had it known that the FMV Loan was not at least an investment loan with a chance of being a commercial loan, then First Mount Vernon would have had no reason not to lend under Subtitle 10 of Title 12), and (c) First Mount Vernon would suffer detriment were a court to now hold that the FMV Loan is not an investment loan given that (i) an investment loan, as set forth below, necessarily constitutes a commercial loan as well, *see infra* pp. 646–47, and (ii) part of the interest charges imposed on the FMV Loan are usurious unless such loan is a commercial loan. In order to clarify the Court's preceding holding, the Court notes that it holds only that the

since she obtained either the Initial Loan or the 1st Refinancing Loan.

Debtor is equitably estopped to deny that the FMV Loan is an investment loan; the Court does not hold that the Debtor is likewise equitably estopped to deny that the FMV Loan is a commercial loan because (a) the declaration in at least one of the Loan Documents (the Borrower Affidavit to be precise), by virtue of the insertion therein of the phrase "and/or," allows for the Debtor to argue that she declared that the FMV Loan was made for but one, rather than all three, of the stated purposes of business, commercial, and investment, (b) the Court cannot presume that the Debtor would wish to argue now that she declared, and is thus equitably estopped to deny, that the FMV Loan was made for either a business or commercial purpose given that a loan for either such purpose would clearly render the same a commercial loan within the meaning of § 12–101(c)(1), and (c) the Loan Documents were all drafted by First Mount Vernon and, thus, shall be strictly construed against it. The Court's decision regarding equitable estoppel is unaffected by any possible argument by the Debtor that she failed to read any of the Loan Documents prior to signing them and that, consequently, she did not voluntarily represent to First Mount Vernon that the FMV Loan was one for commercial, business and/or investment purposes because the Debtor, even if she failed to read the Loan Documents, is equitably estopped from denying that she read such documents. The preceding conclusion follows because (a) the Debtor, even if she failed to read the Loan Documents, nevertheless signed them voluntarily, (b) equitable estoppel, at least in Maryland but presumably elsewhere as well, need not necessarily be supported by a voluntary representation but can instead be supported by voluntary conduct as well, *see* *supra* p. 644, (c) First Mount Vernon relied on the Debtor's voluntary affixation of her signature to the Loan Documents as evidenced by its decision to proceed with the closing of the FMV Loan, (d) the Debtor has not pointed the Court to any basis upon which the Court could possibly find, let alone provided the Court with minimal evidence sufficient to withstand a cross-motion for summary judgment to the effect, that First Mount Vernon had reason to believe that the Debtor did not read the Loan Documents before she signed them, (e) the Court thus must conclude that First Mount Vernon was justified in so relying on the Debtor's voluntary conduct in the form of her affixation of her signature to the Loan Documents, and (f) First Mount Vernon would suffer detriment were a court to now hold that the Debtor is not bound to what she signed and that, as a result, First Mount Vernon perhaps had no basis for proceeding to lend to the Debtor as if the FMV Loan were an investment loan. The Court's decision regarding equitable estoppel is also unaffected, and First Mount Vernon's reliance upon the substance of the signed declarations by the Debtor contained in the Loan Documents is justified, even (a) if this Court or a reviewing court were to presently hold that a refinancing loan, for purposes of Maryland's usury laws and § 12–101(c)(1) in particular, is characterized by the purpose for which such refinancing is sought rather than the purpose which prompted the initial loan that is sought to be refinanced by way of said refinancing loan, (b) if this Court or a reviewing court were to consequently hold presently that the FMV Loan was for personal purposes and, thus, is not one of investment, and (c) though First Mount Vernon knew when the FMV Loan was made that the Debtor was undertaking such refinancing not so as to make an investment but rather so as to stave off a foreclosure on the Maryland Realty. The preceding conclusion is dic-

tated because, when the FMV Loan was made, the state of the law regarding whether a refinancing loan such as the FMV Loan is to be characterized as an investment loan or not was so unsettled that First Mount Vernon (a) then had every reason to believe that the FMV Loan is one of investment, and (b) thus justifiably relied on the content of the signed declarations by the Debtor to the effect that the FMV Loan is at least an investment loan; indeed, the state of the law remains very much unsettled at the present time, which means that not until the entry of this Court's ruling or any subsequent appeal of the same can one be certain one way or the other as to whether the FMV Loan is one of investment.

## C. Whether an Investment Loan is Necessarily a Commercial Loan Within the Meaning of § 12–101(c)(1)?

■ The Court addresses finally the Debtor's argument that a loan sought so as to permit an investment in a business or commercial enterprise (i.e., an investment loan) is not necessarily also a loan that is made to acquire or carry on the same (i.e., a commercial loan within the meaning of Maryland's § 12–101(c)(1)). As an initial matter, and for the reasons set forth in the preceding section, the Court cannot accept First Mount Vernon's position that the Debtor is equitably estopped to deny that the FMV Loan is a commercial loan within the meaning of Maryland's § 12–101(c)(1). See supra p. 645. Because the Debtor is not so equitably estopped, the Debtor is free to argue as she does that investment loans in general, and the FMV Loan in particular, are not necessarily commercial loans within the meaning of § 12–101(c)(1). However, and unfortunately for the Debtor, the Court rejects such argument by the Debtor if for no other reason than that investment loans in general, and the Initial Loan—and, thus, the FMV Loan—in par-

ticular, fall within the parameters of the plain language of § 12–101(c)(1). The Court holds as it does because, as explained below, any investment in a business or commercial enterprise (a) enables one to acquire, at least in part, such business or commercial enterprise, and (b) also enables such business or commercial enterprise to be carried on.

■ The Debtor maintains that (a) one only acquires a business or commercial enterprise within the meaning of § 12–101(c)(1) if one obtains at least a controlling ownership interest in the same, (b) the Debtor acquired much less than a controlling ownership interest in U.S. Funding when she made her investment in such entity, and (c) the Initial Loan—and, thus, the FMV Loan—consequently was not made to acquire U.S. Funding. The Court rejects such argument, however, because (a) § 12–101(c)(1) says nothing about the acquisition of a controlling interest in a business or commercial enterprise, instead by its broad terms encompassing loans the purpose for which is the acquisition of any portion of a business or commercial enterprise, and (b) the Court cannot conjure up any reason why Maryland's legislature would have wished for § 12–101(c)(1) to be read in such a constricted fashion as is now suggested by the Debtor—indeed, why, for instance, would Maryland's legislature have wished to exclude from its usury laws via § 12–101(c)(1) loans that are made with the purpose of acquiring a 51% ownership interest in a business or commercial enterprise but not similar loans which serve to acquire but a 49% ownership interest therein. Therefore, the Court holds that a loan made with the purpose of acquiring an ownership interest of any size in any type of business or commercial enterprise—such as, for instance, the Initial Loan and, thus, the FMV Loan—falls within that portion of

the plain language of § 12–101(c)(1) dedicated to "acquisition of a business or commercial enterprise" and, thus, necessarily constitutes a commercial loan that is excluded from the reach of Maryland's usury laws.

As well, when one invests funds in a business or commercial enterprise, one generally, if not always, desires that such funds will then be used so as to carry on such business or commercial enterprise. In fact, the Debtor cannot successfully argue anything different with respect to her own investment in U.S. Funding. Indeed, the Debtor procured the Initial Loan—and, thus, the FMV Loan as well—with the purpose of then utilizing the proceeds therefrom to acquire an ownership interest in U.S. Funding, after which she certainly desired that the funds so invested would be utilized so as to carry on what she apparently understood to be the legitimate purpose of U.S. Funding. Moreover, the plain language of Maryland's § 12–101(c)(1) encompasses a loan made with the purpose of aiding in the carrying on of a business or commercial enterprise regardless of whether the borrower for such loan possesses or thereby acquires an ownership interest in such business or commercial enterprise. Therefore, and for instance, § 12–101(c)(1), by its terms, encompasses a loan taken out by a parent to aid a child in the carrying on of a child's business or commercial enterprise even if the parent, by virtue of such aid to such child, does not take back an ownership interest in such child's business or commercial enterprise. In light of the preceding observation, to wit that § 12–101(c)(1) encompasses loans made to carry on a business or commercial enterprise even if no ownership interest therein is owned or thereby obtained, it makes absolutely no sense to hold at the same time that, if a loan is taken out by a borrower so as to

permit such borrower to obtain an ownership interest in a business or commercial enterprise, then such loan will only fall within the parameters of § 12–101(c)(1) if the ownership interest therein obtained is greater than 50%. Therefore, the Court holds that a loan made with the purpose of investing in any type of business or commercial enterprise—such as, for instance, the Initial Loan and, thus, the FMV Loan—also falls within that portion of the plain language of § 12–101(c)(1) dedicated to "carrying on a business or commercial enterprise" and, thus, necessarily constitutes a commercial loan that is excluded from the reach of Maryland's usury laws.

## D. *Conclusion.*

Because the Court holds that the FMV Loan constitutes a commercial loan within the meaning of Maryland's § 12–101(c)(1), First Mount Vernon, as explained in an earlier portion of the instant opinion, was free to charge any interest rate on the FMV Loan that it wished pursuant to § 12–103(e)(1)(ii) and (iii). Consequently, the Court is constrained to conclude that interest charged by First Mount Vernon on the FMV Loan in excess of 18% on an annual basis is not usurious under Maryland's usury laws—of course, the interest charged on such loan up to 18% is, as set forth above, also not usurious under such usury laws. Moreover, the Court ascertains that a genuine dispute does not exist with respect to any fact that is material to any of the findings or conclusions that the Court makes in support of, or including, the ultimate conclusion that is drawn in the preceding sentence herein. Therefore, First Mount Vernon is entitled to a judgment in its favor as a matter of law with respect to the Debtor's usury law violation count. Accordingly, and pursuant to Fed. R.Bankr.P. 7056 and Fed.R.Civ.P. 56, the Court grants First Mount Vernon's cross-motion for summary judgment and denies

with prejudice the Debtor's motion for summary judgment, but only as the same pertain to the Debtor's Count 1 for violation of Maryland's usury laws.

## II.

In Count 2 of her adversary complaint, the Debtor asserts that First Mount Vernon's May 13, 2002 recording of a deed, which deed operated to convey title to the Maryland Realty from the Debtor to First Mount Vernon and which deed was executed by the parties on or about September 26, 2001 (hereafter "the Deed"), is constructively fraudulent under both 11 U.S.C. § 548 and Maryland's fraudulent conveyance provisions. The gravamen of the Debtor's constructive fraudulent conveyance·claim is that the Debtor did not receive reasonably equivalent value in return for the transfer of the Maryland Realty via First Mount Vernon's recording of the Deed, which claim the Debtor makes because she alleges, in turn, that (a) the Maryland Realty was worth $1.1 million on May 13, 2002, and (b) the value of that which she received from First Mount Vernon in return for the recording of the Deed was not worth anywhere near $1.1 million. The Debtor argues, in particular, that she only received approximately $462,000 from First Mount Vernon in return for the Deed that was recorded, which figure (a) consists, as the Court understands it, of approximately $445,000 to pay off the 1st Refinancing Loan plus roughly $17,000 in accrued property taxes and other charges that First Mount Vernon picked up at the time of the making of the FMV Loan, and (b) does not include any amount for accrued but unpaid interest, points, and other various charges relative to the FMV Loan, which omission is due, the Court presumes, to the Debtor's claim in her Count 1 that all such interest and other charges should be disallowed

because of First Mount Vernon's alleged usury law violations.

First Mount Vernon defends against the Debtor's constructive fraudulent conveyance claim by maintaining, *inter alia*, that (a) the Maryland Realty was worth only $733,750 on May 13, 2002, and (b) the Debtor received value from First Mount Vernon in return for the recording of the Deed equal to at least approximately $740,000. The consideration figure· of $740,000 asserted by First Mount Vernon equals the dollar amount of what First Mount Vernon alleges the Debtor owed on the FMV Loan as of May 13, 2002, inclusive of all interest and other charges relative to the FMV Loan that, the Court presumes, were then contractually due and owing. *See* Arthur G. Bennett Aff.,¶ 19 (part of Docket No. 17).

As the Court orally conveyed to the parties at the hearing on the instant matter held on May 21, 2003, the Court shall deny both the Debtor's motion and First Mount Vernon's cross-motion for summary judgment as the same pertain to the Debtor's constructive fraudulent conveyance count because, if for no other reason, a genuine issue exists as to the relevant value of the Maryland Realty on May 13, 2002, which value is unquestionably material to a resolution of the Debtor's constructive fraudulent conveyance count. The Court holds, however, that the value of what First Mount Vernon gave to the Debtor in return for the recording of the Deed is equal to whatever, in fact, is the dollar amount of the Debtor's indebtedness on the FMV Loan as of May 13, 2002, inclusive of all unpaid interest and other charges then due and owing on such loan in accordance with the contracts that pertain to such loan. The Court holds as it does because (a) First Mount Vernon accepted the Deed in full satisfaction of the Debtor's indebtedness on the FMV

Loan, *see* 12/13/02 Stipetich Dep., Docket No. 19, Ex. 18 (copy of the Deed), which acceptance, however, was conditioned on the Debtor's failure to locate a successful purchaser for the Maryland Realty prior to the depletion of an escrow fund, *see* Arthur G. Bennett Aff., ¶ 17, (b) the aforesaid condition attached to First Mount Vernon's acceptance of the Deed presumably did not occur until at or about May 13, 2002, at which time (i) First Mount Vernon recorded the Deed, and (ii) the FMV Loan, pursuant to the Deed, was thus satisfied by virtue of the conveyance of the Deed, (c) the satisfaction of the outstanding balance on the FMV Loan as of May 13, 2002, is thus that which was given by First Mount Vernon to the Debtor in return for the May 13, 2002 recording of the Deed, and (d) all unpaid interest and other charges then contractually due and owing on the FMV Loan must be allowed given that, as set forth in Part I of the instant opinion, none of such interest and other charges are usurious under Maryland's usury laws. Furthermore, the Court does not presently understand the Debtor to disagree with First Mount Vernon that approximately $740,000 was contractually due and owing on the FMV Loan as of May 13, 2002, inclusive of interest and other charges contractually due and owing with respect to such loan. Therefore, and assuming that the Debtor does not contest such $740,000 figure, $740,000 will, for purposes of the Debtor's constructive fraudulent conveyance count, equal the value that the Debtor received in return for the recording of the Deed.

### III.

The Debtor asserts, First Mount Vernon admits, and the Court agrees that the Court has subject matter jurisdiction over each of the three counts contained in the Debtor's adversary complaint, although the statutory basis for such jurisdiction is actually found in 28 U.S.C. § 1334(b) rather than, as is asserted by the Debtor, in 28 U.S.C. § 157(b)(2)(H), (K), and (O); the paragraphs in 28 U.S.C. § 157(b)(2) serve to provide a list of matters that will be considered core proceedings within a bankruptcy court after it has been determined that subject matter jurisdiction therein exists via § 1334(b), which jurisdiction is referred to such bankruptcy court via 28 U.S.C. § 157(a).

The Debtor also asserts that the entirety of the matters raised by way of her complaint constitute a core proceeding pursuant to § 157(b)(2)(H), (K), and (O). First Mount Vernon admits the substance of such assertion by the Debtor. The Court agrees that the Debtor's Count 2, that is the Debtor's constructive fraudulent conveyance action, constitutes a core proceeding pursuant to § 157(b)(2)(H). However, the Court *sua sponte* determines, as it is authorized to do pursuant to 28 U.S.C. § 157(b)(3), that the Debtor's Count 1, that is the Debtor's usury law violation action, constitutes a noncore proceeding notwithstanding the parties' agreement to the contrary. The Court holds as it does because (a) the extent of the Court's subject matter jurisdiction, that is whether a proceeding is core or noncore, must be ascertained separately with respect to each claim for which relief is sought within an adversary proceeding, *see In re Passodelis*, 234 B.R. 52, 62 (Bankr.W.D.Pa.1999) (quoting from and citing to *Halper v. Halper*, 164 F.3d 830, 836 & 838–839 (3rd Cir.1999)), (b) it thus matters not when ascertaining whether the Debtor's usury law violation action constitutes a core matter that the Debtor's separate count for constructive fraudulent conveyance is a core matter, (c) " '[a] proceeding is core [1] if it invokes a substantive right provided by Title 11 [of the U.S.Code] or [2] if it is a proceeding, that

by its nature, could arise only in the context of a bankruptcy case,'" *In re Guild and Gallery Plus, Inc.,* 72 F.3d 1171, 1178 (3rd Cir.1996); *Halper,* 164 F.3d at 836–837, (d) the Debtor's usury law violation claim neither invokes a substantive right provided by Title 11 nor is a proceeding that by its nature could only have arisen within the context of a bankruptcy case, and (e) the Debtor's usury law violation claim does not fall within any of the illustrative matters listed in § 157(b)(2) including, and notwithstanding the contrary plea of the Debtor, those matters set forth in paragraphs (H), (K), and (O) of § 157(b)(2).

Because the Debtor's constructive fraudulent conveyance action constitutes a core matter, the Court is empowered to enter final orders and judgments with respect thereto. *See* 28 U.S.C.A. § 157(b)(1) (West 1993). However, since the Debtor's usury law violation count constitutes only a noncore matter, the Court may enter final orders and judgments regarding such action only if the parties consent thereto. *See* 28 U.S.C.A. § 157(c) (West 1993). Must such consent be express or can it also be implied? Furthermore, if such consent must be express, how can express consent be effected?

▇ The bankruptcy rules straightforwardly provide that, within the context of an adversary proceeding, such as, for instance, the present one wherein arises the Debtor's usury law violation claim, final orders and judgments may not be entered by a bankruptcy court with respect to a noncore matter "except with the *express* consent of the parties." Fed.R.Bankr.P. 7012(b), 11 U.S.C.A. (West 2003) (emphasis added). Relying on such bankruptcy rule, some courts hold that the requisite consent under § 157(c) can only be express and cannot be supplied by implication. *See, e.g., In re Norton,* 87 B.R. 1021, 1022–1023

(Bankr.D.S.D.1988) (finding that the matters at issue therein were noncore despite the parties' agreement to the contrary, failing to find the requisite consent under § 157(c) by implication notwithstanding the parties' aforesaid agreement, and directing the parties to amend their complaint, counter-complaint, and responses thereto so as to indicate whether they expressly consent to the entry of final orders and judgments regarding noncore matters). Such bankruptcy rule notwithstanding, however, much caselaw exists to the effect, indeed perhaps "[t]he substantial weight of authority[ ] indicates[,] that a party can impliedly consent to entry of judgment by the bankruptcy court in a non-core related matter.'" *In re Pisgah Contractors, Inc.,* 215 B.R. 679, 682 (W.D.N.C.1995) (quoting from *In re Johnson,* 960 F.2d 396, 403 (4th Cir.1992), and citing other similar decisions); *see also* 10 *Collier on Bankruptcy* ¶ 7012.11 at 7012–25 n. 3 (Bender 2003) (citing numerous cases to the same effect); *In re Farmland Industries, Inc.,* 2003 WL 1950004 at *4 (Bankr.W.D.Mo.2003) (plaintiff deemed to have consented to the entry of a final order or judgment in a noncore matter by virtue of having filed complaint in the first place). Moreover, case authority exists for the proposition that a defendant's admission that a matter is core "may be deemed an expression of consent to allowing … [a] court to determine … [a] matter, even if it is non-core." *In re Grigsby,* 119 B.R. 479, 484 (Bankr.E.D.Pa.1990), *vacated on other grounds,* 127 B.R. 759 (E.D.Pa.1991). Of course, if such an admission by a defendant constitutes express consent by that party to the entry of final orders and judgments in a noncore matter, then certainly a plaintiff's allegation contained within a complaint to the effect that a matter is core should also constitute similar express consent—indeed, the Court believes that to deem such an allegation by a

plaintiff an expression of such consent is particularly appropriate given that plaintiffs in general, at least in the Court's experience, will, from time to time, allege that matters are core when they full well know the exact opposite, that is that such matters are noncore, with the hope that, by so alleging, perhaps they can obtain the entry of a final judgment by the Court in their favor.

In light of the foregoing, the Court rules that the parties herein expressly consented to the entry of final orders and judgments with respect to the Debtor's usury law violation claim, with such express consent effected by virtue of the Debtor's allegation and First Mount Vernon's admission to the effect that such claim is core; such ruling negates the necessity of having to resolve whether the consent called for by § 157(c) can be supplied by implication. Because the parties consent to the entry of final orders and judgments with respect to the Debtor's usury law violation claim, the Court's rulings in Part I above, to wit that First Mount Vernon's cross-motion for summary judgment is granted and the Debtor's motion for summary judgment is denied with prejudice to the extent that the same pertain to the Debtor's Count 1 for usury law violation, shall constitute a final, in contrast to a proposed, order/judgment upon the Court's full adjudication of the remaining counts within the Debtor's complaint (i.e., Counts 2 and 3 therein). As an aside, the Court notes that, from a practical standpoint, whether its rulings with respect to the Debtor's usury law violation claim can constitute a final order rather than a proposed order may not be significant, and notwithstanding that proposed rulings by a bankruptcy court—both factual and legal—that are the subject of a specific objection are reviewed *de novo* by a district court, *see* 28 U.S.C.A. § 157(c)(1), whereas only legal rulings by a bankruptcy court are subjected to *de novo*

review by a district court on appeal, *see* 1 *Collier on Bankruptcy* ¶ 3.03[3][c] at 3–51 n. 9 & ¶ 5.11 at 5–37 (Bender 2003) (quoting from Fed.R.Bankr.P. 8013). The Court believes as much because the Court disposed of the Debtor's usury law violation claim by way of the entry of a summary judgment, which means necessarily that the Court, in ruling as it did, both (a) abstained from making any findings regarding disputed facts, and (b) thus only drew relevant legal conclusions, which legal conclusions, as set forth above, are subjected to *de novo* review by a district court regardless of whether they are final or proposed; put differently, the Court believes that its rulings with respect to the Debtor's usury law violation claim will be subjected to *de novo* review by the District Court regardless of whether the parties consented to the entry by the Court of final orders and judgments with respect to such claim.

## IV.

**IN SUMMARY,** (a) with respect to the Debtor's usury law violation count, First Mount Vernon's cross-motion for summary judgment is **GRANTED** and the Debtor's motion for summary judgment is **DENIED WITH PREJUDICE,** and (b) with respect to the Debtor's constructive fraudulent conveyance count, both the Debtor's motion for summary judgment and First Mount Vernon's cross-motion for summary judgment are **DENIED WITHOUT PREJUDICE.**